# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**15 JAN 21 PM 2: 59**

CLERK-ALBUQUERQUE

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>$3,275.00 HELD IN VALLEY NATIONAL BANK )<br>ACCOUNT #890628901 IN THE NAME RIO ARRIBA )<br>SHERIFF'S OFFICE SCHOLARSHIP FUND ) | Case No. 15 MR 30 LFG |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____ District of _____**NEW MEXICO**_____ *(identify the person or describe property to be searched and give its location):*

> $3,275.00 HELD IN VALLEY NATIONAL BANK ACCOUNT #890628901 IN THE NAME RIO ARRIBA SHERIFF'S OFFICE SCHOLARSHIP FUND

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*

> $3,275.00 HELD IN VALLEY NATIONAL BANK ACCOUNT #890628901 IN THE NAME RIO ARRIBA SHERIFF'S OFFICE SCHOLARSHIP FUND

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☐ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ____18____ U.S.C. § ___981(a)1(C)___ , and the application is based on these facts:

> SEE ATTACHED AFFIDAVIT.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

John W. Howard/ Special Agent (FBI)
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___01/22/2015___

*Judge's signature*

Lorenzo Garcia/ U.S. Magistrate Judge
*Printed name and title*

City and state: Albuquerque, New Mexico

# DISTRICT OF NEW MEXICO
# ALBUQUERQUE, NEW MEXICO

## AFFIDAVIT

1. I, John W. Howard, Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, Washington, D.C., having been duly sworn, state:

2. I am a Special Agent of the FBI, and am currently assigned to the Albuquerque Division, and have investigative responsibilities including white collar crime and public corruption. The information set forth in this affidavit was derived from my own investigation and/or communicated to me by other employees of the FBI, other law enforcement agencies, and from records and documents that I, and others have reviewed. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to demonstrate probable cause for the issuance of the requested seizure warrant.

## INTRODUCTION

3. This affidavit is in support of an application by the United States of America for a seizure warrant for $3,275 from an account, number 890628901, held at Valley National Bank in New Mexico under the name Rio Arriba Sheriff's Office Scholarship Fund.

4. I am familiar with the extortion investigation of Sheriff Thomas R. Rodella (Rodella). I have reason to believe that the property which is the subject of this affidavit constitutes, or is derived from, proceeds traceable to violations constituting specified unlawful activity under 18 United States Code § 1956 (c)(7) and 18 United States Code § 1961, to wit, Extortion under New Mexico Stat § 30-16-9, and is therefore forfeitable to the United States Government under Title 18, United States Code, § 981 (a) (1) (C). Based on the information in this affidavit, I submit that probable cause exists that funds held in this account were extorted from motorists in Rio Arriba County.



5. Where applicable, true names of victims, innocent third parties, and Deputies have been removed from this affidavit and substituted with initials or representative titles. I attest to the following descriptions of each person note:

T.M. is a person whose identity is known by the United States Government. He/she, as well as his/her son/daughter, A.D. were interviewed by law enforcement.

E.H. is a person whose identity is known by the United States Government. He/she was interviewed by law enforcement.

J.H. is a person whose identity is known by the United States Government. He/she was not interviewed in the matter, but his/her attorney, T.G., who represented J.H. in this matter, was interviewed by the FBI.

T.G. is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. T.G. represented J.H. in the matter.

J.S. is a person whose identity is known by the United States Government and who was interviewed by the FBI on multiple occasions, as well as his/her mother L.V.

L.V. is a person whose identity is known by the United States Government and who was interviewed by the FBI on multiple occasions, as well as her son/daughter, J.S.

A.S. is a person whose identity is known by the United States Government. He/she was interviewed by law enforcement. His/her father, R.S., a person whose identity is known by the United States Government was interviewed by the FBI.

G.T. is a person whose identity is known by the United States Government and who was interviewed by the FBI.

M.T. is a person whose identity is known by the United States Government and who was interviewed by the FBI.

E.V. is a person whose identity is known by the United States Government and who was interviewed by the FBI.

E.F. is a person whose identity is known by the United States Government and who was interviewed by the FBI.

W.W. is a person whose identity is known by the United States Government and who was interviewed by the FBI.



D.J. is a person whose identity is known by the United States Government and who was interviewed by the FBI.

Deputy A is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. Information provided by Deputy A was independently corroborated.

Deputy B is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. Information provided by Deputy B was independently corroborated.

Deputy C is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. Information provided by Deputy C was independently corroborated.

Deputy D is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. Information provided by Deputy D was independently corroborated.

Deputy E is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. Information provided by Deputy E was independently corroborated.

Deputy F is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. Information provided by Deputy F was independently corroborated.

Deputy G is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. Information provided by Deputy G was independently corroborated.

Deputy H is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. Information provided by Deputy H was independently corroborated.

Deputy I is a person whose identity is known by the United States Government and who was interviewed by the FBI in the matter. Information provided by Deputy I was independently corroborated.

6. I make this affidavit in support of an Application for a Seizure Warrant relative to the following:

Funds in Valley National Bank Account #890628901 for an amount up to $3,275.



## FACTS AND CIRCUMSTANCES

7. Rodella was the Sheriff of Rio Arriba County and was elected to the office in 2010. He took office in 2011.

8. The Rio Arriba Sheriff's Office Scholarship Fund (RASOSF) is a Domestic nonprofit charity registered in the State of New Mexico and was incorporated by Thomas R. Rodella and the Board of Directors. The Board of Directors includes Rodella, Jean-Claude D. Arnold (Arnold), and Richard Guillen (Guillen).

9. RASOSF's Registered Agent is Arnold. RASOSF's New Mexico State Corporation Commission (NMSCC) number is 4540301. The address for RASOSF provided to the Public Regulation Commission is 1122 Industrial Park Road, Espanola, New Mexico 87532.

10. The address for the Rio Arriba County Sheriff's Office (RACSO) is 1122 Industrial Park Road, Espanola, New Mexico 87532.

11. The address provided to the Public Regulation Commission for RASOSF's Registered Agent, Arnold, is 1122 Industrial Park Road, Espanola, New Mexico 87532.

12. The RASOSF maintains a bank account at Valley National Bank located at 322 N. Riverside Drive in Espanola, New Mexico. The account is number #890628901 and was established on or about February 22, 2012 as a non consumer, corporation, not for profit account. The authorized signors on the account are Rodella, further described as Chair of RASOSF, Arnold, further described as Director/Agent of Service of RASOSF, and Guillen, further described as Director/ Secretary of RASOSF.

13. The following deposits relevant to this affidavit were found during a review of records for Valley National Bank account number #890628901:

A. Deposit on or about April 11, 2103 of a $500 Western Union Money Order, number 14-659975045 purchased by J.C.
B. Deposit on or about February 7, 2013 of a $300 Western Union Money Order, number 14-632098422 purchased by E.H.
C. Deposit on or about January 16, 2013 of a $500 Century Bank Official Check number 359042 purchased by D.R. on behalf of T.M.



D. Deposit on or about February 1, 2013 of a $500 Wells Fargo Personal Money Order number 0870817064 purchased by L.V. on behalf of J.S.

E. Deposit on or about April 22, 2013 of two New Mexico Bank and Trust Money Orders; number 54601190 and 5460119 for $300 each for a total of $600 purchased by M.T. on behalf of G.T.

F. Deposit on or about April 11, 2013 of a $500 US Postal Money Order, number 21066328034 purchased by E.V.

G. Deposit on or about February 7, 2013 of a $100 US Postal Money Order, number 20830148245 purchased by W.W.

H. Deposit on or about December 13, 2012 of a $200 Del Norte Credit Union Cashier's Check number 0000771452 with the remitter noted as A.S.

I. Deposit on or about July 25, 2012 of a $75 Citizens Bank personal check in the name of T.G. The check was for the benefit of J.H.

14. I have reviewed a document[1] bearing a seal representative of the Rio Arriba County Sheriff's Office. The Document is titled "Rio Arriba Sheriff's Office Scholarship Fund" and includes the address 1122 Industrial Park Road, Espanola, New Mexico 87532. The undated document lays out the guidelines for the RASOSF. According to the document, the RASOSF was established by Rodella and members of his staff to aid college students from Rio Arriba County who are pursuing law enforcement related studies. Preference in the program was to be given to students enrolled at Northern New Mexico College. Scholarships were to be awarded on a semester-by-semester basis and are made after consultation with the student financial aid office of the college in question. The document also states the "Fund's application with the IRS for 501(c)(3) status is pending and approval is expected by the end of the 2012 calendar year. The anticipated IRS approval makes any contribution to the Fund tax deductible."

15. The document also states "All of the Fund's operations are conducted by volunteers who are staff members of Rio Arriba Sheriff's Office. The Fund pays no fees to any staff member or fundraising consultants. All professional services the Fund must obtain are provided by volunteers/supporters on a pro bono basis."

16. The RASOSF never applied for IRS 501(c)(3) status and thus there was no application pending. After an FBI investigation became public knowledge following news reports from an April 17, 2013 Search Warrant issued by the United States Court for the District

---

[1] Document included as Attachment A.

of New Mexico executed at the RACSO. On or about April 26, 2013 Rodella and Arnold attended a meeting at the RACSO where many of the RACSO Deputies were in attendance. During the meeting, Arnold stated "....That's all done... in the process of getting what's known as a 501C3 designation from the federal government. This has nothing to do with being non-profit, this has to do with whether the organization is tax exempt. You can be a charity, you can be a non-profit, and not necessarily be tax exempt. The tax exemption status means that anybody who contributes to that kind of organization then can count that as a charitable deduction on their income tax return. That's in progress. We have a federal tax ID number which is appropriate, and so on and so on...."

17. Arnold made the statement in the presence of Rodella, both of whom were already aware there had been no application for 501(c)(3) status.

18. On or about September 9, 2013, I interviewed Arnold and he stated "I ha- I had discussions with people in the IRS at one of their 800 numbers, but I-we have never actually filed an application for the 501(c)(3) with the IRS." On or about September 10, 2013, I interviewed Arnold again and when asked if Rodella was aware there had been no application for 501(c)(3) status. Arnold answered that Rodella was aware the application had never been submitted.

19. I have reviewed the New Mexico Charitable Organization Registration Statement for the RASOSF. According to the document, the RASOSF was established on or about July 26, 2011 as a Charity/Scholarship Fund. Addresses provided for the fund are PO Box 1492, Santa Cruz, NM 87567 and 1122 Industrial Park Road, Espanola, NM 87532. The "Charity Purpose" is to "Raise funds to provide scholarships for college students from Rio Arriba County who are pursuing academic studies in law enforcement and related fields." The individuals noted under "Charity Individuals" are Arnold and Rodella. The following questions and answers were also noted:

Individuals who are authorized to sign checks: Rodella, Thomas, Sheriff

Individuals who are responsible for fund raising: Arnold, Jake, Public Affairs Officer
Rodella, Thomas, Sheriff

Individuals who are responsible for the distribution of funds: Rodella, Thomas, Sheriff



Individuals who have custody of financial records: Arnold, Jake, Public Affairs Officer
Rodella, Thomas, Sheriff

Individuals who have custody of funds: Rodella, Thomas, Sheriff

20. I have reviewed the Articles of Incorporation (Articles) for the RASOSF. The Articles were received by the New Mexico Public Regulations Commission on or about December 1, 2011. According to Article X, Thomas R. Rodella is the Incorporator and the document, dated November 21, 2011, bears a likeness of his signature. Under Article II of the By-Laws- Objectives and Dedication "....the Corporation shall seek monetary donations from individuals, corporate citizens and other entities and distribute those funds, or the earnings derived from prudent investments made with those funds, in the form of scholarships for the benefit of those aforementioned students who are enrolled in a recognized institution of higher learning established under the laws of the State of New Mexico and who are pursuing a degree or professional certificate in the field of law enforcement or a related field of study (seemed (sic) appropriate by the Directors of the Corporation) at said institution. The Corporation shall pay all such scholarships directly to the said institution of higher learning, stating the stipulation that the scholarship shall be applied to tuition and other costs specifically associated with the said student's course of study as described above. Subject to the foregoing, the Corporation may also engage in all other activities which are permissible by law."

21. My review of the Articles of Incorporation for the RASOSF and its By Laws indicated Rodella was the custodian of the funds and the only person authorized to disburse funds for the scholarship.

22. Guillen was interviewed regarding the RASOSF. According to Guillen, he was hired on a contract basis to serve as a consultant and advisor. Guillen did not have law enforcement authority under his contract. Within the first few months of Guillen starting the contract work, Rodella mentioned the RASOSF for kids. Around the summer of 2011, Rodella had Arnold do some research to determine what was required for a scholarship fund. In around the fall of 2011 a one page document was prepared with the first line reading "Sheriff Thomas R. Rodella and members of his staff have established the Rio Arriba SO Scholarship Fund....". The creation of



the fund was released to the press around the fall of 2011. Rodella and Arnold arranged for a day when the three of them could go to Valley National Bank in order to sign signature cards. Rodella wanted two signatures for any disbursements.

23. According to Guillen, the contract he worked under expired in June of 2012. When the contract expired, he was unaware of any activity pertaining to the RASOSF. He had been aware of at least one donation but no disbursements. Guillen never solicited any money for the fund and he was unaware of any active solicitations for donation. The Deputies of the RACSO were not involved in the RASOSF and the fund was not set up as a means of getting out of jail or having charges dismissed. You could not pay into the RASOSF to get out of a ticket. Guillen was a former police officer and was aware you could not pay money into a fund to get out of a ticket. When Guillen was affiliated with the RASOSF, there was no program whereby Deputies acted as "Judge and Jury". According to Guillen "[i]t would not have happened while I was there."

24. In April of 2013, Rodella stated the following while explaining the RASOSF to a subordinate:

> ".....So ah...I get a call a-again from (E.F.) so he tells me, shh-couldn't you help my bro? And I told him I just did. The family came to pick up the car. He said no, can't you help him with the charges. I told him can't un-undo that ah, ah (E.F). I told him that stuff doesn't happen like that bro. I told him you know there, there's a program that ah that I can ah, ah, that, that I can suggest ah that he use, I told him, but that's all I can do. And, and he says well what is it? And I told him, he just makes a, ah donation I told him, and that's that. And he says well let me call him on his cell. So...he calls me right back and he says he's ah...an he, you know he's willing to, he's willing to, to, to take that option. So I went in and, and I told ah, I told (Deputy A), hey (Deputy A) ah this kid seems to be interested in using ah the scholarship program. He says yeah he, he says he told me. And, and I told him well how, how did you just have this conversation? I told him I just had it now ah with, with someone else. He says no, he says a while ago when we were outside he asked me well can't you guys help me? And I told him yeah, you know, if, if ah, y-you know, if you wanna consider this, we d-you know, w-we, we can help you out. So in front of (Deputy A), I told him look (E.F.) has been calling...and, and this is what he wants and, and he talked to you, he says yeah I think and I'll take it, and I told him well hold on. I told him, you know, there's a little bit of a catch I told him. (Deputy A) needs to agree to it I told him, and I haven't heard (Deputy A) say that he's willing, I told him, so...make sure that (Deputy A) understands ah, I



mean that, that you understand that (Deputy A) needs to agree. So I go inside…back to my office. And somewhere I picked up that (Deputy A) had checked with Magistrate Court, and Joe was w-willing to make himself available so that he could go arraign (J.C.). So (Deputy A) takes him over there…and Joe releases him under his own recognizance. Five days later…he shows up at the office, J.C. does, and ah, and ah…delivers a donation, um I think they were two separate money orders, I can't remember. But delivers a five hundred dollar ah, ah money order for a donation ah…before he walks out the door, he gives me a hell of a hug and walks out."

25. Rodella's own words identify the program as the "scholarship program".

26. It was not uncommon for the dismissal program to be referred to as the "scholarship fund" by RACSO Deputies. When interviewed, Deputy C made the following statement when asked what his understanding was of the scholarship program:

Deputy C: My understanding, my understanding of the scholarship pro-program is that…if somebody is issued a speeding citation…or ah a citation, and they ask for help, that they're, they're given the option, if they want it, they can donate to the scholarship fund. See this…the way I understood it is that this um scholarship fund was put in before I got hired here. So the way it worked is if, if ah they agree to the scholarship fund and, and then that was their option, that they wanted to contribute, there wasn't a set amount, it was whatever amount they wanted. That the, that the, that the deputy at his ah, at the, the prosecutor, which would be the deputy, at his discretion, would dismiss the ticket. So that was my understanding of it.

27. Later, during the same interview, Deputy C stated:

Deputy C: Yes. So I figured, okay, you know what, I'm not gonna, I'm not gonna dismiss the ticket okay? I'm not. Then I remembered about the scholarship fund, so I told him there's two options, I said there's two options that are your choice. We can go to court, or you can have the option of the scholarship fund. You've got four entities. You got Crime Stoppers I said, you have ah Peace Keepers, which is Native American um…something to do with domestic violence. I said you have um…the sheriff's scholarship fund, and there's another one, I can't remember what it, the name of it is. And he goes, you know what, I would lo-I would greatly love to ah contribute to your scholarship fund. I said well you got those four that you have to choose from I said. And he goes okay, I, I wanna do that. How much do I have to donate? I said it's an amount of your choice. I can't set an amount.

SA Howard: (UI) said five dollars.



Deputy C:     Then it's five dollars.

SA Howard:    So he walks on a ticket for five dollars?

Deputy C:     It, it's a scholarship and it, it's a scholarship…

SA Howard:    Where does the money go?

Deputy C:     It goes into the scholarship ah bank account.

SA Howard:    And then where?

Deputy C:     And then it stays in there until I, see, I don't know how this works.  I don't know if, if, if somebody comes in and says ah, or a school comes in and say we're looking for a scholarship, I don't know how that works.  But I know that it's in a bank account…"


28. Despite knowing there was more than one option on the form, Deputy C continually referred to the dismissal program as the "scholarship" program.  All nine of the donations made in exchange for charges being dismissed went to the RASOSF.  No donations were made on behalf of the other charities listed on the form through the dismissal program.

29. According to Deputy D, when E.H. was allowed to pay $300 for the dismissal of the citation for a violation of New Mexico Uniform Traffic Code (NMUTC) section 66-8-122G, Rodella was upset the "donation" had not been $500.  When Deputy D called Rodella to explain the situation, Rodella hung up on him.

30.  There were 18 known donations to the RASOSF.  Nine of the donations are believed to have been made by local businesses or are unattributed.  The remaining nine donations were made by individuals cited for violations of the NMUTC based on the New Mexico Criminal and Traffic Law Manual (NMCTLM).  Of those nine, one was for careless driving, two were for speeding, and six were for Driving with a Revoked or Suspended License.  All of the citations were written by on-duty RACSO Deputies.  The Deputies were acting in their official capacity at the time the citations were written and in their official capacities at the time the citations were



dismissed by Magistrate Court except for two citations which were never filed. The citations that were not filed were for E.H. and J.S. and were for violations of NMUTC § 66-8-122-G.

31. Six of the motorists who "donated" to the RASOSF were arrested for 66-8-122-G. New Mexico law requires the immediate appearance before a magistrate for the violation. No exceptions are provided in the statute.

32. NMCTLM, Section 66-8-122, Immediate appearance before magistrate, states:

Whenever any person is arrested for any violation of the Motor Vehicle Code [66-1-1 NMSA 1978] or other law relating to motor vehicles punishable as a misdemeanor, he shall be immediately taken before an available magistrate who has jurisdiction of the offense when the:

A. Person requests immediate appearance;
B. Person is charged with driving while under the influence of intoxicating liquor or narcotic drugs;
C. Person is charged with failure to stop in the event of an accident causing death, personal injuries, or damage to property;
D. Person is charged with reckless driving;
E. Arresting officer has good cause to believe the person arrested has committed a felony;
F. Person refuses to give written promise to appear in court or acknowledge receipt of a warning notice; or
G. Person is charged with driving when his privilege to do so was suspended or revoked pursuant to Section 66-8-111 NMSA 1978 or pursuant to a conviction for driving while under the influence of intoxicating liquor or drugs.

33. Additionally, NMCTLM, Section 66-5-39, Driving while license suspended or revoked; providing penalties, states:

A. Any person who drives a motor vehicle on any public highway of this state at a time when his privilege to do so is suspended or revoked and who knows or should have known that his license was suspended or revoked is guilty of a misdemeanor and shall be charged with a violation of this section. Notwithstanding any other provision of law for suspension or deferment of execution of a sentence, if the person's privilege to drive was revoked for driving while under the influence of intoxicating liquor or drugs or a violation of the Implied Consent Act [66-8-105 NMSA 1978], upon conviction under this section, that person shall be punished by imprisonment for not less than seven consecutive days and shall be fined not less than



three hundred dollars ($300) or not more than one thousand ($1,000) dollars and the fine and imprisonment shall not be suspended, deferred or taken under advisement. No other disposition by plea of guilty to any other charge in satisfaction of a charge under this section shall be authorized if the person's driving privilege to drive was revoked for driving while under the influence of intoxicating liquor or drugs or a violation of the implied Consent Act. Any municipal ordinance prohibiting driving with a suspended or revoked license shall provide penalties no less stringent that provided in this section.

    A. In addition to any other penalties imposed pursuant to the provisions of this section, when a person is convicted pursuant to the provisions of this section or a municipal ordinance that prohibits driving on a suspended or revoked license, the motor vehicle the person was driving shall be immobilized by an immobilization device for thirty days..... The convicted person shall bear the cost of immobilizing the motor vehicle.

    B. The division, upon receiving a record of the conviction of any person under this section upon a charge of driving a vehicle while the license of the person was suspended, shall extend the period of suspension for an additional like period...

34. The New Mexico Criminal and Traffic Law Manual (NMCTLM), Section 4-44-21, No Compensation except as provided by law, states:

No county officer shall accept or receive to his own use, or for or on account of any deputy or deputies, clerk or clerks appointed by him or employed in his office, or for or on account of expenses incurred by him of [or] by any such deputy or deputies, clerk or clerks, or for or on account of his office, any salary, compensation, allowance, fees or emoluments in any form whatsoever, other than [as] authorized by law.

35. The Rio Arriba Sheriff's Office Policies and Procedures manual states in Section IV, General Duties, E. Gifts, Gratuities, and Rewards:

1. Employees will not solicit any gifts, gratuities, loans or fees where there is any direct or indirect connection between the solicitation and the Official employment.
2. Employees will not accept either directly or in-directly and gift, gratuity, loan or fee or any other thing of value arising from or offered because of sheriff employment or any activity connected with law enforcement employment.
3. Employees will not accept any gift, gratuity ot other thing of value, the acceptance of which might tend to influence directly or indirectly the actions of the employee or any other employee in any manner of official business; or which might tend to cast any adverse reflection on the Office or any employee therefore.



NOTE: The Sheriff may authorize a change on a specific case by case basis.

## PRIVATE PROGRAM AND PUBLIC RESOURCES

36. According to Arnold, the dismissal drogram and the RACSOSF were separate and distinct. The RASOSF existed prior to the dismissal program. The Dismissal Program was a way of "dealing with a situation ah where people with traffic tickets would be coming in and saying can you do something for me? Can you, can you dismiss this? Can you make it go away?" Arnold went on to say "This fund and the dismissal program is distinctly separate, obviously though that there is a connection because the scholarship fund might benefit from the dismissal program, assuming that people chose ah chose that option."

37. According to Arnold, the Dismissal Program[2] documents would be available under the state inspection of public records act. The bank records for the RACSOSF would not be available for public inspection.

38. When asked about the formality of the program and the means of funding the RASOSF, Arnold stated the following:

SA Howard: Do you think Rodella woulda done this without...any form?

Arnold: Oh no. I don't think he would because I, I think that he ah, that the intent was this has to be formalized, and there has to be a record of it. Ot-ot- otherwise who knows what could happen. The idea was that, it was gonna be very upfront about what was being done, and these would become, I mean...you know, those forms under the state ah inspection of public records act would be available for public inspection no matter what.

SA Howard: Go-the, the dismissal forms?

Arnold: Yeah.

SA Howard: What about the bank records?

Arnold: The which? The bank records?

---

[2] Attachment B contains two examples of the form.

SA Howard:   Yes.

Arnold:      No, because the bank, b-b-because the ah are you talking about the bank records of the scholarship fund?

SA Howard:   Yes.

Arnold:      Yeah, no.  No because the scholarship fund was not, is, was not a public entity.

SA Howard:   Right, but it was being funded through ah public servants.

Arnold:      N-um...well I, I'm, I, I...the, the source of the funding in h-ah, ah especially when we start off, with the original contributions to that, just, just by citizens, I don't see that as coming under, under (UI), no.

SA Howard:   Right, not, not the, not the...the public donations but...my thing with it is you have deputies that are on duty, on county time soliciting funds for a private charity.

Arnold:      I don't know that any, that any deputies were soliciting funds for anything.

SA Howard:   Well, okay but they're, the-the...(voices overlap)

Arnold:      I don't know that.  I just don't know that.

SA Howard:   Okay, with the pretrial diversion program...those funds were generated using county resources.

Arnold:      Um...(stutters) and, and I'm not sure what, what county resources you're talkin' about...(voices overlap)

SA Howard:   Well the...(voices overlap)

Arnold:      ...because I don't see, I, I was not aware that there was any soliciting done by the deputies.  You may have information to the conqu-the contrary, but I was not aware...(voices overlap)

SA Howard:   Well...

Arnold:      ...that there was any soliciting going on.

SA Howard:   ...by soliciting I mean the person's in the back of the car, they say is there any way I can, I can get out of this?  Can you help me out?  And the deputy says yes, there's a, a program where you can donate money to a private charity.

| Arnold: | Well um…um, and of course th-th-three of the ah, three of those things I, I don't know whether you'd call that a private charity. The county's DWI program and, and ah, and Peace Keepers, and Crime Stoppers and so on, I don't know if you'd call those private charities. |
|---|---|
| SA Howard: | Okay so, so… |
| Arnold: | But I don't know that any such conversation occurred with the deputies. The point was, all the, it, it, it, it to my knowledge, every single instance of somebody contributing to the ah, ah under the, to a, to one of those entities, under the dismissal program, that a citation was issued. This was not in exchange for not issuing a citation, it was rather how the citation then was handled after it was already filed. And to my knowledge, there was a citation issued to all of these people. |
| SA Howard: | Right, and the agreement was it would be dismissed if they made a donation right? |
| Arnold: | Well I don't know that that was part of the ah agreement late-um at, at the time the citation was issued. I have no knowledge about that. But it was after the fact that the citation was filed in court then that the people would come in and, and, and fill out those forms. |
| SA Howard: | But the dismissal was an exchange for the donation right? |
| Arnold: | Um, as far as I, as, as I can see, the dismissal was an exchange for a donation, yes. |
| SA Howard: | Okay. So…it sorta, I mean…and let's say three of those are public…charities and, and then the scholarship fund is a private charity. |
| Arnold: | Hmm. |
| SA Howard: | The person's pulled over, they're given the option of making a donation to… |
| Arnold: | I don't know that they're given an option w-w-w-when they were pulled over. I don't know how many times I have to say that. |
| SA Howard: | Well at some point they're given the option of making a donation in exchange for a ticket being dismissed. |
| Arnold: | At some, later point in time, after the citation was filed, there was that option that, that ah, that people availed themselves of. How that option was actually communicated, I am not sure, but I do know that there were |



numerous instances before this dismissal program was instituted where people would come in and ask the deputy or the sheriff, wouldn't you please dismiss it? And in some occasions the deputy would dismiss. Just simply because ah, okay, I'm not gonna bo-this is not an important, important enough and I have o-you know, ah other commitments on the trial date, I don't know, but I do know that people would come in. People would call me from time to time…and say, hey what can I do about a traffic ticket? And I said, I don't know what you can, what you need to do is talk to the deputy or talk to the sheriff. I just don't know and I would, I would, I tried to get out of those con-con- kind of conversations as quickly as poss-as possible.

SA Howard:  But w-w-would-wouldn't you agree though that the dismissal of the ticket was done while the deputy was on duty? It's an official act and it's in exchange for a donation to a private charity.

Arnold:  I don't know if I would necessarily agree with that. You, you know, I have a hard time with these questions, wouldn't you agree, when they're phrased wouldn't you agree.

SA Howard:  Okay well then…

Arnold:  I, I mean I will, I'm, I'm…(voices overlap)

SA Howard:  Okay, I, I won't, I'm sorry, I won't phrase 'em that way.

Arnold:  Yeah I mean (laughs) that, that, that's just…

SA Howard:  But, but, but clearly the deputies are on duty when they're dismissing a ticket.

Arnold:  Yeah. Well I mean I, I, I think you're asking me to come to a, to a conclusion about law that has some, has some implications about where, where this matter is going, and I'm not sure that I'm in a position to really offer um a judgment um about that. I go back to my conversation with AUTHOR and (his/her) letter when (he/she) said a deputy can do it for any or no reason. And seemed to be fully aware of what I was suggesting or a scenario that I had presented (him/her), and um basically got (his/her) seal of approval.

SA Howard:  So for any or no reason, but that wouldn't include washing their car or something like that.

Arnold:  No. I don't think that would include washing their car. (laughs) No.

SA Howard:    But, but that's…

Arnold:    Um…

SA Howard:    …but that falls under any or no.

39. Crime Stoppers was not aware they were potentially beneficiaries of the program until local media ran stories about the dismissal program.

40. The Rio Arriba County DWI Prevention Program was not aware they were potentially beneficiaries of the program.

41. Peacekeepers Domestic Violence Counseling Program was not aware they were potentially beneficiaries of the program.

42. Northern New Mexico College (NNMC) was unaware any of their students were the potential beneficiaries of the scholarship and the individual interviewed regarding scholarships at NNMC learned about the RASOSF on the news.

43. No scholarships were awarded.

## CITATIONS AND DISMISSALS

44.    I have reviewed State of New Mexico Uniform Traffic Citations (Citation) as well as Rio Arriba Sheriff's Office Request for Pre-Trial Diversion/Dismissal forms (RASODD) and have verified them against State of New Mexico Notice of Dismissal of Criminal Complaint (NMDCC) forms.  My review determined the following:

45. J.C. received Citation number 1054205 8 on or about March 7, 2013.  The Citation was filed on or about March 7, 2013 in Magistrate Court.  J.C. signed a RASODD form on or about March 12, 2013 indicating a donation to the RASOSF.  The form was signed by Rodella. J.C.'s NMDCC shows his charges dismissed on or about March 12, 2013. J.C. was driving on a suspended license at the time of his/her stop.

46. E.H. received Citation number 1056154 6, Citation number 1056155 3 and Citation number 1056156 1 on or about February 1, 2013.  Citation number 1056155 3 and Citation number 1056154 6 were filed on or about February 6, 2013 in Magistrate Court.  Citation number 1056156 1, issued for driving on a revoked license, was never filed.  E.H. signed a RASODD form on or about February 1, 2013 indicating a donation to the RASOSF.  The form



was signed by Rodella. E.H.'s NMDCC shows his/her filed charges dismissed on or about April 17, 2013. E.H. was driving on a suspended license at the time of his/her stop.

47. T.M. received Citation number 1054433 6 and Citation number 1054433 6 on or about November 15, 2012. The Citations were filed in Magistrate Court on or about November 20, 2012. T.M. signed a RASODD form on or about January 16, 2013 indicating a donation to the RASOSF. The form was signed by Rodella. T.M's NMDCC shows his/her charge pertaining to driving on a suspended license was dismissed on January 16, 2013. T.M. was driving on a suspended license at the time of his/her stop.

48. J.S. received Citation number 1053537 5 and Citation number 1053536 7 on or about February 1, 2013. The Citation for driving with a revoked license, Citation number 1053536 7, was not filed. The other citation was filed in Magistrate Court on or about February 13, 2013. J.S. signed a RASODD form on or about February 1, 2013 indicating a donation to the RASOSF. The form was signed by Rodella. J.S. plead to a turn signal violation on or about March 1, 2013. J.S. was driving on a revoked license at the time of his/her stop.

49. J.T. received Citation number 1054795 8 on or about April 13, 2013. The Citation was filed in Magistrate Court on or about April 15, 2013. J.T. signed a RASODD form on or about April 13, 2013 indicating a donation to the RASOSF. The form was signed by Rodella. J.T.'s NMDCC shows his/her charges were dismissed on or about April 15, 2013. J.T. was driving on a suspended license at the time of his/her stop.

50. E.V. received Citation number 1053539 1 on or about February 2, 2013. The Citation was filed in Magistrate Court. E.V. signed a RASODD form on or about April 22, 2013 indicating a donation to the RASOSF. The form was signed by Rodella. E.V.'s NMDCC shows his/her charge was dismissed on or about June 13, 2013. E.V. was driving on a suspended license at the time of his/her stop.

51. W.W. received Citation number 1052817 2 on or about August 4, 2012. The Citation was filed in Magistrate Court on or about August 10, 2012. W.W. signed a RASODD form on or about February 5, 2013 indicating a donation to the RASOSF. The form was signed by Rodella. W.W.'s NMDCC shows his/her charges were dismissed on or about February 5, 2013.



52. A.S. received Citation number 1053212 5 on or about December 1, 2012. The Citation was filed in Magistrate Court on or about December 10, 2012. A.S. signed a RASODD form on or about December 12, 2012 indicating a donation to the RASOSF. The form was signed by Rodella. A.S.'s NMDCC shows his/her charge was dismissed on or about December 13, 2012.

53. J.H. received Citation number 1051386 9 on or about March 16, 2012. The Citation was filed in Magistrate Court on or about April 5, 2012. J.H., through his attorney, was allowed to make a $75 donation to the RASOSF and a check was mailed to the RACSO. J.H.'s NMDCC shows his/her charges were dismissed on or about June 26, 2012.

### J.C.

54.     On March 7, 2013 J.C. received Citation number 1054205 8 for 66-5-39, Driving while license suspended or revoked. A Statement of Probable Cause was drafted by the arresting officer and a Criminal Complaint was filed on or about March 7, 2013 in Magistrate Court, Rio Arriba County. According to the Statement of Probable Cause, J.C. was stopped after being caught traveling 45 mph in a 35 mph zone by Deputies using LIDAR (Light Detection and Ranging). The Deputy motioned for J.C. to pull into the RACSO rear parking area as the stop occurred adjacent to the RACSO building. J.C. provided the Deputy a false name during their initial interaction. After further investigation at the scene, the Deputy discovered J.C.'s actual identity and he was placed under arrest. J.C. was arraigned the same day and bonded out for what he believed was $500. Prior to the bond being paid, Rodella removed J.C. from the holding cell and took him to his office. Once in the office, Rodella began telling J.C. he could help him out. Rodella explained that there was a scholarship fund and for a $500 donation to one of four different funds, the charges would be dropped and dismissed. When J.C. reviewed the sheet he observed the top one was the RASOSF. According to J.C., he knew his other option was to go to jail for seven days and pay a fine. The penalty would end up costing him more than $500.

55. On or about March 12, 2013, J.C. signed a RASODD referencing 1054205 8.

56. The charges referenced on the RASODD were Revoked Driver's License and Concealing Identity.



57. The final approval on the RASODD was Rodella.

58. I have reviewed a Western Union Money Order, number 14-659975045, issued on or about March 12, 2013 which was deposited in the RASOSF account #890628901. The Money Order was made out to the Rio Arriba Scholarship Fund for $500 and the purchaser identified on the Money Order was J.C..

59. J.C.'s charges were dismissed on or about March 12, 2013.

### T.M.

60. On or around February 11, 2013 during a Magistrate Court hearing, T.M. made an appearance regarding a seatbelt violation. During the course of the hearing, the Magistrate noted that T.M. was driving on a revoked license at the time of his citation. The Magistrate went on to inform T.M. he was lucky he was not arrested when he was stopped. T.M. responded that he had already paid $500 for the revoked license. The Magistrate noted that the record did not reflect a fine having been paid. Following the exchange between the Magistrate and T.M., E.H., who had been sitting in the audience awaiting her time before the Magistrate, informed the Magistrate that he/she had also been stopped in Rio Arriba County by a Deputy Sheriff and told if he/she paid $500 into the RASOSF his/her charge for driving on a revoked license would be dropped. According to E.H., he/she only had $300 at the time and provided the money to the Deputy Sheriff. E.H. informed the Magistrate he/she was cited for lacking vehicle registration and insurance and then released by the RACSO Deputy.

61. According to T.M., he/she was stopped on November 15, 2012 while returning from an appointment in Truchas, New Mexico. When pulled over, T.M. was arrested and taken to the Rio Arriba County Sheriff's Office in Espanola. T.M. spent one day in jail and was bonded out. Approximately a month later, T.M. spoke with Rodella about the citation. Rodella told T.M. that if he/she donated $500 to a scholarship fund the matter would be taken care of. T.M. arranged for a check to be provided to Rodella.

62. I have reviewed a Century Bank Official Check, number 359042 made out to the RASOSF for $500. The check remitter is A.D., the same person to whom T.M. was released



from custody to. The check deposited into the RASOSF account #890628901 on or about January 16, 2013.

## E.H.

63. According to E.H., a RACSO Deputy pulled him/her over while driving in Velarde, New Mexico. After pulling over, a second RACSO Deputy arrived at the scene. E.H. was informed his/her driver's license was revoked and he/she was going to be arrested and held on a $1,200 bond. E.H. was handcuffed and placed in a RACSO vehicle. E.H. was then informed that for a $500 donation to a scholarship fund the charges would be dropped. E.H. stated he/she was only able to come up with $300. He/she was able to pay the $300 because he/she had just received his/her Social Security check. E.H. suffers from diabetes and other health issues and was feeling sick during the encounter. E.H. was then transported, while handcuffed, in a RACSO marked vehicle, to the Del Norte Credit Union in Espanola where he/she withdrew $300 in cash from the drive-up window. E.H. was then transported to the RACSO. At the RACSO, E.H.'s son picked up the $300 cash and obtained a Money Order. E.H. was provided a receipt for the money by a RACSO Deputy and instructed to show up for her court hearing and plead "Not Guilty". The charges would then be dropped. E.H. stated that while at Magistrate Court, another individual was explaining a similar situation to the Magistrate and he/she relayed the information about his/her situation and the similarity of the circumstances.

64. I have reviewed a Western Union Money Order for $300, number 14-632098422 issued on or about February 1, 2013. The Money Order is made out to the RASOSF and is signed by E.H.. The Money Order was deposited into the RASOSF account #890628901 on or about February 7, 2013.

## J.H.

65. J.H. received a speeding ticket for going 10 miles per hour over a posted 55 mph. J.H. hired an attorney, T.G. to handle the citation. T.G. contacted RACSO to find out what could be done. T.G. was informed there was a program whereby a donation to a charity of his choice would result in the citation being dismissed. After several attempts to re-contact the RACSO by phone, T.G. wrote a letter inquiring how to go about making the charitable donation. T.G. or his/her assistant was then contacted by a RACSO employee and informed he/she should send a



check for $75 made out to the RASOSF. T.G. sent in the check and then received a dismissal in the mail.

66. I have reviewed a copy of a Citizens Bank check for $75, number 1066 dated July 23, 2012 signed by T.G.. The check is made out to RASOSF. The name J.H. appears in the Memo block. The check was deposited into the RASOSF account #890628901 on or about July 25, 2012.

67. I have reviewed J.H.'s citation, Citation number 1051386 9. Under "Penalty Assessment" the fine is noted as $75.

### W.W.

68. W.W. was issued SNMUTC citation number 1052817 2 on August 4, 2012 for driving 69 mph in a 55mph zone, a violation of 66-7-301. The citation was issued by a Rio Arriba County Sheriff's Deputy. W.W. decided to fight the ticket in court. The hearing date was continued several times over the next six months. After further continuances were denied, W.W. appeared for his/her hearing. While at the hearing, the RACSO Deputy who issued the citation asked W.W. to step outside. Once outside, the Deputy informed W.W. the citation would be dismissed if a donation was made to "the Rio Arriba Scholarship Fund". W.W. asked how much needed to be donated and was told between $50 and $100. W.W. asked if he/she could pay cash but was told the donation needed to be via money order. W.W. then departed the courthouse and purchased a Money Order which he/she had made out to Rio Arriba Scholarship Fund per the instructions. W.W. filled out a RASODD on or about February 5, 2013 and his/her ticket was dismissed on or about February 5, 2013.

69. I have reviewed a United States Postal Service Money Order, serial number 20830148245 dated February 5, 2013 in the amount of $100, made out to RASOSF. The Money Order bears the name W.W. and the check was deposited into the RASOSF account #890628901 on or about February 7, 2013.

### A.S.

70. A.S. was issued Citation number 1053212 5 on December 1, 2012 for Careless Driving, a violation of 66-8-114(B). A.S. was driving home from volleyball practice when



he/she was in a single car accident. A RACSO Deputy arrived at the scene and informed him/her that he/she would be cited for Careless Driving. A.S. never went to court for the citation and was never given a copy of the citation. A witness at the scene recalled hearing the Deputy say they would receive a copy of the citation in the mail. A.S.'s car was towed from the scene by a family member. Approximately two days later, A.S.'s father contacted Rodella to inquire as to whether there was anything that could be done to resolve the ticket. Rodella replied he was unaware of the citation and would look into it. A day or two later, Rodella called A.S.'s father back and asked him to come down to the office to discuss the ticket. A.S.'s father met with Rodella and was told the options available were to go to court or make a contribution to crime stoppers, operation DWI, the scholarship fund, and another fund he could not recall. A.S.'s father asked how much he needed to donate and Rodella replied words to the effect of a reasonable amount, whatever you can afford. A.S.'s father stated he could afford $300 but Rodella agreed to $200. A.S. was then shown a copy of the RASODD. After A.S.'s father made the donation, Rodella called the citation issuing Deputy and informed him A.S.'s father had made a donation. Rodella then informed the Deputy it was up to him if he wanted to dismiss the citation or go to court. The Deputy informed A.S.'s father he would dismiss the citation. When interviewed about the matter, A.S.'s father stated he made the contribution in exchange for the citation being dismissed and if the citation was not going to be dismissed, he would not have made the contribution.

71. I have reviewed a del Norte Credit Union Cashier's Check, number 0000771452 dated December 12, 2012 in the amount of $200 made out to RASOSF. The check remitter is A.S. The check was deposited into the RASOSF account #890628901 on or about December 13, 2012.

## J.S.

72. According to J.S., a RACSO Deputy responded to an accident J.S. had been involved in. J.S. had been turning into a driveway in Ojo Caliente, New Mexico. The vehicle he/she was driving did not have signal lights and he/she was hit from behind. J.S. was arrested for driving on a revoked or suspended license, then transported to the RACSO facility and placed in a holding cell. During that time, J.S. was informed by the arresting officer that for a $500 donation to a scholarship fund the charges would be dropped. J.S. called his mother, L.V., and told her about



the $500. A little while later, the arresting officer's boss came in and told J.S. the same thing about the $500 fund. L.V. came to RACSO with the $500, the arresting officer took the driving with a revoked license citation back from L.V. who had been holding it and J.S. was released. J.S. went to court on or about March 1, 2013 for the faulty lights on his/her vehicle citation.

73. I have reviewed a Wells Fargo Personal Money Order, number 0870817064 dated February 1, 2013 in the amount of $500 made out to RASOSF. The Money Order is signed by L.V. The check was deposited into the RASOSF account #890628901 on or about February 1, 2013.

<strong>G.T.</strong>

74. According to G.T., he/she was caught illegally dumping weeds in an arroyo by the Bureau of Land Management (BLM). After BLM Officers discovered he/she had a revoked license, they contacted RACSO. Two RACSO Deputies responded and arrested G.T. After being placed in the back seat of the RACSO unit, G.T. asked about his/her truck. One of the RACSO Deputies said his mother, M.T. and another person was coming to pick it up. As they were driving, the RACSO Deputy driving recognized M.T. coming from the opposite direction and pulled over to speak with her. G.T. could not hear what was being said, but his mother later told G.T. the RACSO Deputy informed her of the scholarship fund for $600. The RACSO Deputy returned to his unit and continued to transport G.T. to the RACSO facility. G.T. asked the Deputy how much his/her bond was and the RACSO Deputy responded $1,200 and if he/she did not have the bond money he/she would be transported to Tierra Amarilla County Jail. The RACSO Deputy then went on to say there was a scholarship fund for either $500 or $600 which he informed G.T.'s mother about that would result in G.T.'s citation being dismissed. When they arrived at RACSO, the Sheriff asked G.T. if he/she was informed about the scholarship fund. G.T. said he/she had and the Sheriff wanted to know if G.T.'s mother was coming down to RACSO. G.T. asked the Sheriff if the scholarship fund was legal and the sheriff replied, "Don't worry about it, it's legal, just bring me the money order." G.T. was not placed in a holding cell and was seated with the RACSO Deputies until his/her mother showed up. When M.T. arrived at the RACSO, a RACSO Deputy took the money order from her and another RACSO Deputy removed G.T's handcuffs. G.T was assured by the RACSO Deputy that the charge would not



show up on his/her record. According to M.T., the RACSO Deputy asked her how much she wanted to donate to the scholarship fund and she picked half the amount of the bond.

75. I have reviewed two New Mexico Bank and Trust Money Orders, number 54601190 dated April 13, 2013 for $300 and number 54601191 dated April 13, 2013 for $300. The purchaser's name on both is M.T. and both are made out to RASOSF. Both checks were deposited into the RASOSF account #890628901 on or about April 22, 2013.

### E.V.

76. According to E.V., he/she was pulled over by a RACSO Deputy and cited for driving with a suspended license and arrested. E.V. was placed in the RACSO unit, then he/she called his/her father to pick up his/her car. While E.V. was being transported to RACSO, he/she asked the RACSO Deputy if there was any way he/she could get a break as he/she was aware the ticket would result in seven days in jail and a $1,000 fine. The RACSO Deputy informed E.V. there was a scholarship program E.V. could make a donation to whereby the ticket would be dismissed. The RACSO Deputy called it the Rio Arriba Scholarship Fund. The RACSO Deputy then placed a cellular telephone call and addressed the other person on the call as "Sheriff". After the RACSO Deputy got off the phone, he informed E.V. the cost for the dismissal on a driving while revoked because of a DWI ticket was $500. When they arrived at the RACSO facility, E.V. called his/her father and asked him/her to bring a $500 Money Order for the Rio Arriba Sheriff's Office Scholarship Fund, a $1,200 Money Order for his/her bond, and a $5 Money Order for the processing fee. E.V. was informed by the RACSO Deputy that he/she needed these money orders in order to be released that day. E.V.'s father showed up with the money orders and E.V. was released. E.V. had also been cited for careless driving that day, but when they arrived at the RACSO facility he/she observed the RACSO Deputy tearing the citation up. The RACSO Deputy said he/she did it because E.V. had been honest with him about having a suspended license.

77. I have reviewed a United States Postal Money Order, number 21066328034 dated March 27, 2013 for $500. The Money Order payee is "RASO" and in the Memo line it says "Scholarship Fund". The purchaser of the Money Order is E.V.. The Money Order was deposited into the RASOSF account #890628901 on or about April 11, 2013.



78. Rodella made the following statement to a subordinate RACSO Deputy regarding the RASOSF:

Deputy B:   I don't know. I'm just throwing out a (J.S.) cause I have ah, ah court
            appearance here for a (J.S.) and I was thinking is that the one? And then I
            have a court appearance coming up with (E.H.) on the 23rd, on Tuesday, the
            23rd, which is this coming Tuesday. What, what do I do on that?

Rodella:    (E.H.)?

Deputy B:   (E.H.)'s the one that we did the scholarship fund for.

Rodella:    What, what, what, what'd, what'd you signed with her is that in exchange
            for, for the ah donation you would dismiss the charges.

Deputy B:   Right.

Rodella:    So it seems to me then that, that, that we didn't meet our end of the
            obligation.

Deputy B:   Okay, I just got these from, from um…Melissa a couple of days ago.
            Yesterday, day before.

Rodella:    I think you need to cross reference, make sure that, that you're squared
            away…on, on it being the same charges. That it's the same case. Because,
            you know by, by signing off and making the ah, the ah donation, basically
            the agreement is that you're gonna dismiss charges.

Deputy B:   Okay, yeah, it's the same tickets. I'm looking at 'em with ah notice of trial.

Rodella:    Well it, it seems to me that you may have an obligation (Deputy B).

Deputy B:   An obligation to go dismiss 'em?

Rodella:    Yes, if that's, if that's the, if, if that's the agreement that you entered into.
            Do you, do you have any of those forms?

Deputy B:   Ah no, I don't…(voices overlap)

Rodella:    That are (UI, voices overlap)

Deputy B:   …no, I don't carry those with me.

Rodella:    The pretrial diversion?

Deputy B:   No. I don't carry 'em with me.

Rodella:   You know I th-I think if you look at it, that's basically what ah what you're saying.

Deputy B:  Okay, yeah, no I just didn't know what to do now, you know, I didn't know what…what you wanted me to do on my end, you know with, with…with everything coming down. I, I'm just…(voices overlap)

Rodella:   W-(UI, voices overlap)

Deputy B:  …I'm, I'm lost. I don't know what, what I'm supposed to do, where I'm supposed to go now, what…you know (laughs).

Rodella:   Who overlooked this when you did it?

Deputy B:  That what?

Rodella:   Who, who walked you through it?

Deputy B:  Um…(Deputy E) and (Deputy D). Remember (Deputy D) called you? And everything was done via phone. Through-with you and (Deputy D).

Rodella:   I can't remember. Where was I? That I, that it was over the phone?

Deputy B:  I have no idea. Because all I know is (Deputy E) and I were doing saturation and (Deputy E)'s the one that brought it up and made mention that (Deputy F) had done one earlier in the day.

Rodella:   Hmm. I ca-I can't ah…

Deputy B:  And that was the same day that we got the alarm call, or that somebody was breaking in to the new school in Alcalde. It was in the evening. (voices overlap)

Rodella:   Oh yeah that we all ended up over there?

Deputy B:  Remember that we all ended up over there.

Rodella:   Yeah.

Deputy B:  And (Deputy E) and I were…(voices overlap)

Rodella:   Yeah I, so, so (UI, voices overlap) away and…

Deputy B:  …were partnered up.

Rodella:   …your numbers were low or somethin' there, I remember a few of those things.

Deputy B: Right.

Rodella: Or somethin' like that.

Deputy B: Right. We had had a hard day that day. We weren't getting our citations and then calls were coming in and we were helping the emergency calls as they came in.

Rodella: Somebody had gotten stabbed or somethin'. Somebody stopped one of the deputies while they were on a traffic stop, and they ended up handling some case... Right?

Deputy B: Right. Yeah.

Rodella: Yeah. Yeah, it seems to me that ah...you know if you, a,eh, the, the alternative on, on, on (E.H.), if, if ah, if you don't dismiss it is you better...w-you know, we better return the money. Because that seems to me like it's, you know, it, it's like the, it, it's a form, it's a contract that you've entered into. And you say, and, and basically what you're saying, you're saying is that ah, ah and let me read it to you, cause I have, I have one sittin' on top of my ah, my ah table. (makes noise)...

Deputy B: And with ev-e-all this coming down and, you know, could I get in trouble for that? Am I gonna get in trouble? Where, you know...

Rodella: No I don't ah I don't see, I don't see how (Deputy B), but I mean I think that we need to ah...I think (UI) what I need to do at this point is sit down with Jake and explain to him that there may be a case that hasn't been completed.

Deputy B: And where does Jake play a part in all of this?

Rodella: Jake put the ah, put the f-ah...put the forms together. Ah...here...the second paragraph it says I understand...and this is the person that's signing. I understand that such pretrial diversion dismissal may be granted in the interest of just, justice. Efficiency of the criminal (UI) furtherance of public policy as es-as established by the Rio Arriba Sheriff and in recognition of completely voluntary donation I am making to one of the law enforcement related dah, dah, dah, dah. But, but it says I understand that such pretrial diversion dismissal may be granted, and it's signed by you, it's signed by ah, by ah...by ah the supervisor. I, I don't know who the supervisor who would of...ah (Deputy D) you said, and me.

Deputy B: Right.

Rodella: So it's got three signatures, or three lines for signatures.

Deputy B: Right.

Rodella: Let me, let me call ah…let, let me call Jake and, and ask him ah, you know, what his, what his thoughts on this, cause I, I, I, I, I think it's very, very clear. And we only have one of two choices. Either we return the money, or you go in and dismiss it cause that's, that's basically when, when you ah, when, when you entered into that agreement, that, that was your understanding right?

Deputy B: Right. Yeah, but I just got this notice of trial now. I didn't, I had no knowledge that, you know, the citations had gone in. I hadn't checked at court. I, like I said I just got these. As a matter of fact it was Tuesday. You know I can go in and check with Melissa, but I think it's Tuesday that she gave me these notice of trials.

Rodella: Okay. So let me, let me give ah, let me give Jake a call ah, are, are, are you're not on the road are you?

79. The two individuals referenced in the call, J.S. and E.H. were both cited under NMCTLM 66-8-122G but they were never transported to a Magistrate and charges for that violation were never filed.

80. No one from the RACSO contacted the District Attorney's Office for approval or legal guidance with respect to the RASOSF or the RASODD.

81. No one from the RACSO contacted the County Attorney for approval or legal guidance with respect to the RASOSF or the RASODD.

82. No one from the RACSO contacted the County Manager for approval or administrative guidance with respect to the RASOSF or the RASODD.

83. In January or February of 2013, prior to news reports about the program, Rodella was contacted by an employee with the Rio Arriba County Manager's Office to inquire as to whether tickets were being dismissed in exchange for donations. Rodella responded "no, we're not doing that." Rodella then inquired as to where the employee heard the information.

84. On or about December 23, 2012, D.J. was stopped by Deputy H with the RACSO for not wearing a seatbelt. While Deputy H was speaking with D.J., he/she commented that he/she smelled like pot. Deputy H then requested assistance from RACSO Deputy G. Meanwhile,



Deputy H asked D.J. if he had any weapons in the vehicle. D.J. disclosed he/she had a firearm in the back of his vehicle. Deputy H said he/she needed to remove it for officer safety. Deputy G arrived and administered several driving under the influence (DUI) tests. When Deputy G completed the tests, he asked D.J. when he/she last smoked and D.J. replied an hour ago. D.J. was arrested and/or cited for DUI, possession of marijuana, negligent use of a firearm, no seatbelt, and no registration. Deputy G placed D.J. in the back of his RACSO unit and transported D.J. to the RACSO. When they arrived at the RASO, D.J. was placed in the booking cell. After approximately an hour in the booking cell, D.J. and another person in custody were placed in handcuffs and taken out of the cell by Deputy G and Deputy H to be transported to Tierra Amarilla County Jail. While the four of them stood outside the RACSO waiting for a RACSO unit to pick them up, D.J. kept asking Deputy G for a break. Deputy G replied, "You want a break, do you have $500?" When D.J. asked what for, Deputy G replied, "We have a scholarship fund for kids who are in high school who are having a hard time and want to become police officers. It's a scholarship program." D.J. asked Deputy G if he/she would take a check and Deputy G said, "No, you go to jail." D.J. was arraigned on the DWI charge.

85. On or about January 5, 2013, D.T. was pulled over by RACSO Deputy I. D.T. admitted to taking a few puffs of marijuana earlier that day and Deputy I accused him/her of being under the influence. Deputy I arrested D.T. and transported him/her to the RACSO. D.T. was cited for DUI (driving under the influence), no insurance, and no registration. While in route to RACSO, Deputy I told D.T. about the RACSO scholarship fund. D.T. ignored Deputy I because he/she was upset for being arrested. D.T. thought Deputy I said the fund was $300 or $500. D.T. did not further discuss the fund with Deputy I. D.T. was taken to see a Magistrate and was then transported to Tierra Amarilla County Jail. Following D.T.'s release from jail he/she returned to the RACSO. While there he/she overheard someone talking about the RASOSF and asked if he/she could have the scholarship option. The RACSO deputy went to a back room, then came back out and said no, because D.T. had not taken the opportunity when it had been offered.

## ADMINISTRATIVE OFFICE OF THE COURTS

86. According to Arnold, the RASOSF and the ticket dismissal program were separate and distinct. The RASOSF existed on its own merits. Arnold did not see the dismissal program



as directly related to the scholarship fund but rather a way of dealing with a situation where people with traffic citations would have access to a remedy. According to Arnold, four different entities were selected to benefit from the program, the scholarship program being one of them. While the fund and the dismissal program are distinct, there was obviously a connection in that one of the programs that benefitted was the RASOSF. Arnold selected the other three programs based on his conversation with the Administrative Office of the Courts (AOC). Arnold prepared the initial dismissal form and later created a second form which corrected some formatting errors he found.

87. Arnold stated he was unaware solicitation for the program was being done roadside or while donors were in custody:

| Arnold: | It's AOC. Where we presented ah what we're doing to the AOC and asked them what their, you know, advice was, what we-you know, if it's proper or not, and (Author), who's the, an attorney with the AOC and he/she is head of the Magistrate Court Division. Um, well you can read it. |
| --- | --- |
| SA Howard: | Sure. |
| Arnold: | Um, gave us, you know, somewhat direction on that. Based on that, we came up with a form, and we have a policy that people are not solicited to do this. It's if they come to, people come to us all the time and say well can you dismiss my traffic ticket? Can you m-can we make that go away? I said well there's a possibility, but it's gotta go through this process. You gotta fill out this form, and, and, and, and see if it can be done. And we believe that ah what the advice we got from the AOC, ah tells us that, that's ah perfectly appropriate thing to do. |
| SA Howard: | So it...this never occurs at the roadside, it always occurs here after this-after the ticket's been issued? |
| Arnold: | Excuse me? |
| SA Howard: | The, the, the ah offering the program never occurs at the point of the traffic stop? |
| Arnold: | No. |
| SA Howard: | Never? |
| Arnold: | No. I, I'm not aware that if (stutters) anybody ev-ever has. I think there's only been seven instances where people have contributed money. |

| | |
|---|---|
| Deputy C: | And it, and it, and it better not be happening at the traffic stop, I mean I'm new in the (Specifies Rank) position, but that, that's unethical if that's happening. |
| Arnold: | Yeah. |
| Deputy C: | You know. |
| Arnold: | As a matter of fact, one of the reporters...(voices overlap) |
| Deputy C: | That's not right. |
| Arnold: | ...with the Rio Grande Sun was just here, and he happened to have a, have a ticket um for busting a stop sign or something like that. And I ah asked him, it's Nathan (UI), and I said Nathan...was the deputy polite to you? Yeah. Did the deputy tell you that you could m-m-mail it in to the fines bureau, or you could appear in court, one of the two, which is the standard procedure? Yes. Did the deputy ever solicit you for any kinds of contribution? He said no, never mentioned it. It's only when people come back to us and say is there some way that we could take care of this? I mean, there are times when deputies will dismiss for whatever reason, you know. You see it and it's a bad case, it's a bad citation, something like that, it can be done. And that's basically the direction we got (Author) at the AOC. |

88. Arnold stated he was unaware of the dollar amount of the donations made in the RASODD program until the FBI executed a Search Warrant at the RACSO.

89. The first known "donation" in exchange for a citation dismissal occurred on or about July 23, 2012. The citation was issued on or about March 16, 2012.

90. On November 20, 2012, four months after the first dismissal, Arnold received the referenced letter from the AOC regarding a telephone conversation from "last week"[3]. The letter begins by articulating a question Arnold asked with respect to whether the magistrate court would be willing to order defendants to make a donation to a reputable charity in return for a dismissed sentence. The AOC response was that the court may only order a defendant to make payment to a charity as a condition of probation or of an order deferring or suspending sentence under NMSA Section 31-20-6(E)(2007). The letter further states, the section authorizes the

---

[3] Attachment C is a redacted copy of the letter.

court to require the defendant to make a contribution between $10.00 and $100.00 "to a local crime stopper program, a local domestic violence prevention or treatment program, or a local drug abuse resistance education program that operates in the territorial jurisdiction of the court." The paragraph ends with "So the court does not have the authority to do what you originally proposed."

91. The next paragraph summarizes what was discussed whereby "we then discussed whether the prosecutor could dismiss a case if the defendant contributed to a reputable charity. You mentioned that the Rio Arriba County Sheriff's Office has established a scholarship fund, has registered that fund with the Attorney General's Office, and is seeking approval for that fund under the Internal Revenue Code as a tax-exempt 501(c)(3) entity." "I replied that it is up to the prosecutor if the prosecutor wishes to dismiss a case. The prosecutor may dismiss for no reason or any reason. The Administrative Office of the Courts is certainly not in the business of telling prosecutors how to prosecute their cases, so I respectfully leave the decision of whether to implement such a policy to Sheriff Thomas Rodella. My concern is that the court must not be asked to sign off on such a policy in any way, as that is outside of the sentencing authority granted to the court by the Legislature. I add now that many judges will not even allow a reference to the terms of such a settlement between the prosecutor and the defendant to be filed in the court file, out of concern that the court must not be seen to be involved in such an arrangement. If your recollection differs from mine, please let me know."

92. Author from the AOC was interviewed regarding the letter. According to Author, it was not unusual for a letter to be drafted following a telephone conversation. Author did not know Arnold and the conversation was the first they had. Author recalled telling Arnold that Author was unable to express an opinion in reference to the matter Arnold was calling about. Author pointed out that the sentence regarding not being able to tell prosecutors how to prosecute their cases and leaving the Sheriff to decide on his own was not tacit approval of the program, it was a reinforcing statement that the AOC could not provide guidance on the matter. Author went on to say that during the conversation it was made clear to Arnold that in the example of a judge allowing a donation to a charity, the charity is not controlled by the court or by the judge. Author also stated Arnold never provided the scenario where defendants would donate to the RASOSF in exchange for the dismissal tickets. After the conversation with



Arnold, Author believed Arnold may have been fishing for an endorsement and wrote the letter in order to clarify. The intent of the letter was to address what a magistrate could do, not what a prosecutor could do. Author also wanted to be clear the AOC was not giving a "thumbs-up" to anything. Author got the impression that Arnold got more of an endorsement than Author intended and did not know if Arnold was clear of what was being told to him. Arnold never contacted Author again on the matter. Rodella never contacted Author on the matter. When Rodella was a Magistrate he had, on occasion, called the AOC for information.

93. Author was clear that no scenario provided by Arnold included a donation to a charity controlled by Rodella.

94. During a meeting at the RACSO that occurred on or about April 26, 2013, after the existence of the investigation became public, Arnold made the following statement:

> "In the beginning we received a number of contributions and donations from people that didn't have any tickets with the sheriff's office. Didn't have anything. There's a whole history of several thousand comin' in from p-people simply here in the community. Um…let's move up to late 2012. The sheriff asked me to contact and research, or contacted the people who know what, what, supposedly what they're talking about and find out if when the court, the Magistrate Court tells somebody that as a condition of your probation or a condition of a deferred sentence where you're gonna get the charges dismissed…and I think you've all been through that and, and, and it, and, and you know how that works, that would our scholarship fund be an eligible charity that the court could say give it to them. (Author), who's an attorney, and (he/she) said that the Magistrate Division of the administrative office of the courts, I've known (Author) for some time, said no because the statutory requirement with the court does it, for one is only ten dollars to a hundred dollars is the most that you can do. It's not like doing community service, you go out there and you donate forty hours to, to some or, or, or, organization or every committee that's doing good work."

## CONCLUSION

95. I believe probable cause exists for the belief that the $3,275 in proceeds in Valley National Bank Account number 890628901 under the name Rio Arriba Sheriff's Office Scholarship Fund constitutes proceeds of extortion. I believe this affidavit established probable cause the "donations" made to the RACSO resulted from communications intended to wrongfully obtain money and/or compel persons to do an act against their will. The funds were not applied to the county or state coffers, but instead were deposited in a bank account controlled by, among others, Rodella.

96. I believe probable cause exists for the belief that the donations were obtained with the intent to wrongfully obtain something of value and/or wrongfully compel persons to do acts against their will. Therefore, the property constitutes, or is derived from, proceeds traceable to violations constituting specified unlawful activity under 18 United States Code § 1956 (c)(7) and 18 United States Code § 1961, to wit, Extortion pursuant to New Mexico Stat § 30-16-9, and is therefore forfeitable to the United States Government under Title 18, United States Code, § 981 (a) (1) (c).

I swear that the information is true and correct to the best of my knowledge and belief.

John W. Howard
Special Agent
Federal Bureau of Investigation
Albuquerque, New Mexico

Subscribed and sworn to before me this __ day of January, 2015.

The Honorable Lorenzo F. Garcia
UNITED STATES MAGISTRATE JUDGE



# *Rio Arriba Sheriff's Office*
## *Scholarship Fund*

1122 Industrial Park Road, Española New Mexico 87532

Rio Arriba Sheriff Thomas R. Rodella and members of his staff have established the **Rio Arriba Sheriff's Office Scholarship Fund** to aid college students from Rio Arriba County who are pursuing law enforcement-related studies.

College student citizens of Rio Arriba County are eligible for support from the Fund. Other eligibility requirements include enrollment in at least six-hours of courses related to law-enforcement/criminal justice and/or enrollment with a study plan leading to a degree in a field directly related to law enforcement.

Preference is given to students enrolled at Northern New Mexico College, but Rio Arriba students enrolled in other New Mexico colleges are also eligible. Scholarships are awarded on a semester-by-semester basis. All scholarship awards are made after consultation with the student financial aid office of the college in question. Scholarships are awarded on the basis of both merit and financial need.

All of the Fund's operations are conducted by volunteers who are staff members of Rio Arriba Sheriff's Office. The Fund pays no fees to any staff member or fund-raising consultants. All professional services the Fund must obtain are provided by volunteers/supporters on a pro bono basis.

All contributions to the Fund are to be dispersed as scholarships with the exception of minimal organizational expenses required by the regulatory agencies, i.e. the New Mexico PRC and the IRS. The Fund has no recurring "overhead" or "office" expenses.

The Fund is registered as a charity with the Office of the New Mexico Attorney General (registration number 45-2832891). The New Mexico Public Regulation Commission approved its articles of incorporation and bylaws as a non-profit corporation effective December 1, 2011 (corporation ID number 4540301).

The Fund's application with the IRS for 501(c)(3) status is pending and approval is expected by the end of the 2012 calendar year. The anticipated IRS approval makes any contributions to the Fund tax deductible.

Contribution checks should be made payable to: "**Rio Arriba Sheriff's Office Scholarship Fund.**"

**Attachment A**



Arthur W. Pepin, Director
Patrick T. Simpson, Deputy Director
Karen S. Janes, Director
Magistrate Court Division



237 Don Gaspar, Room 25
Santa Fe, NM 87501
(505) 827-4800
(505) 827-4824 (fax)
www.nmcourts.gov

November 20, 2012

Mr. Jake Arnold
Public Information Officer
c/o Rio Arriba County Sheriff's Office
1122 Industrial Park Road
Espanola, New Mexico 87532

### RE: <u>Our Telephone Conversation Last Week</u>

Dear Mr. Arnold:

Thank you for your courteous telephone call to me last week. This confirms our conversation.

Your first question was whether the magistrate court would be willing to order defendants to make a donation to a reputable charity in return for a dismissed sentence. I explained that by statute, the court may only order defendant to make payment to a charity as a condition of probation of an order deferring or suspending sentence under NMSA Section 31-20-6(E) (2007). That section authorizes the court to require defendant to make a contribution of between $10.00 and $100.00 "to a local crime stopper program, a local domestic violence prevention or treatment program or a local drug abuse resistance education program that operates in the territorial jurisdiction of the court." So the court does not have the authority to do what you originally proposed.

We then discussed whether the prosecutor could dismiss a case if the defendant contributed to a reputable charity. You mentioned that the Rio Arriba County Sheriff's Office has established a scholarship fund, has registered that fund with the Attorney General's Office, and is seeking approval for that fund under the Internal Revenue Code as a tax-exempt 501(c)(3) entity.

I replied that it is up to the prosecutor if the prosecutor wishes to dismiss a case. The prosecutor may dismiss for no reason or any reason. The Administrative Office of the Courts is certainly not in the business of telling prosecutors how to prosecute their cases, so I respectfully leave the decision of whether to implement such a policy to Sheriff Tommy Rodella. My concern is that the court must not be asked to sign off on such a policy in any way, as that is outside of the sentencing authority granted to the court by the Legislature. I add now that many judges will not even allow a reference to the terms of such a settlement between the prosecutor and the defendant

**Attachment C**



to be filed in the court file, out of concern that the court must not be seen to be involved in such an arrangement.

      If your recollection differs from mine, please let me know. Again, thank you for a very courteous conversation.

Sincerely yours,



cc:

**Attachment C**

# Rio Arriba Sheriff's Office

## Request for Pre-Trial Diversion/Dismissal

Name: ██████████ ████████ ████

Last          First          Middle

Address: ████████████████████████████████████████████

Nature of Citation/Charge/Arrest: ████████████████████████████

Citation/RASO Case Number: ████████████████    Date Issued/Arrested: ████████████

Citing/Charging/Arresting Deputy & RA #: ████████████████████████████

On a purely voluntary basis--and without any coercion, threat, promise or inducement other than what is indicated below—I seek pre-trial diversion/dismissal of the matter described above, in which I am a suspect/defendant I understand that this matter is eligible pre-trial diversion/ dismissal on the basis of prosecutorial discretion, as recommended by the above-named RASO deputy, pending approval by Rio Arriba **Sheriff Thomas R. Rodella**.

I understand that such pre-trial diversion/dismissal may be granted in the interests of justice, efficiency in the criminal justice system, furtherance of public policy as established by the Rio Arriba Sheriff and in recognition of the completely voluntary donation I am making to one of the law enforcement-related, non-profit organizations designated below. My money order/cashier's check made out to that organization is enclosed.

- (✗) Rio Arriba Sheriff's Office Scholarship Fund

- ☐ Crime Stoppers

- ☐ Rio Arriba County DWI Prevention Program

- ☐ Peacekeepers Domestic Violence Counseling Program

████████████████████████████

Suspect/Defendant's Signature

Recommended/Approved by Deputy ████████████████████ Date ████████

Recommended/Approved by Supervisor _____ Date: _____

Approved by Rio Arriba **Sheriff Thomas R. Rodella** ████████ Date: ████████

**Attachment B**

# *Rio Arriba Sheriff's Office*

# Request for Dismissal/Pre-Prosecution Diversion

Defendant/Suspect Name: _____
Last    First    Middle Initial

Address: _____

Nature of Incident/Citation/Charge/Arrest: _____

Date & Location of Incident: _____ Citation/RASO Incident #: _____

Citing/Charging/Arresting Deputy & RASO #: _____

   On a purely voluntary basis--and without any coercion, threat, promise or inducement other than what is indicated below—I seek dismissal/pre-prosecution diversion in the matter described above, in which I am a defendant/suspect. I understand that this matter is eligible for dismissal/pre-prosecution diversion on the basis of prosecutorial discretion, as recommended by the RASO law enforcement officer(s) indicated below, pending approval by **Sheriff Thomas R. Rodella**.

   I understand that such dismissal/pre-trial diversion may be granted in the interests of justice, efficiency in the criminal justice system, furtherance of public policy as established by **Sheriff Thomas R. Rodella** and recognition of the voluntary donation I am making to one of the non-profit organizations designated below. I understand that, in the instance of pre-prosecution diversion, "good conduct" and other conditions may apply.

   My money order/cashier's check made out to that organization in the amount of $ _____ is attached. I understand this item will be returned to me if my request is not approved and this matter could then proceed with prosecution.

- ☐ Rio Arriba Sheriff's Office Scholarship Fund
- ☐ Crime Stoppers
- ☐ Rio Arriba County DWI Prevention Program
- ☐ Peacekeepers Domestic Violence Counseling Program

_____ D.O.B. ___/___/___ Date: _____
Defendant/Suspect's Signature

Recommended by Deputy: _____ Date: _____
Signature & RASO #

Recommended by Supervisor: _____ Date: _____
Signature & RASO #

Approved by **Sheriff Thomas R. Rodella**: _____ Date: _____

**Attachment B**

